[Crim. No. 2879.   First Dist., Div. Two.   Mar. 9, 1954.]

THE PEOPLE, Respondent, v. KENNETH W. SKINNER, Appellant.

Leslie C. Gillen and William F. Cleary for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Charles E. McClung, Deputy Attorney General, for Respondent.

DOOLING, J.—This is an appeal from a judgment and an order denying a motion for a new trial. Appellant was charged in an indictment with eight counts of murder. He was convicted of the included offense of manslaughter in eight counts and was sentenced to the state prison at San Quentin for the period prescribed by law for each count, the sentences to run concurrently.

Early in the morning of July 22, 1951, the College Court Apartment house at 214 Haight Street in San Francisco was destroyed by fire. Eight persons who were tenants in the apartment house died in the fire.

The fire apparently started some time between 4:35 and 5 in the morning. Mr. James Pope delivered the Examiner newspaper to 214 Haight on the morning of the fire. He arrived at the premises around 4:35 a. m. and stayed there approximately three minutes. Pope entered the building, passed through the lobby, delivered papers on the first, second and fourth floors. He noticed no smoke or fire nor did he see anyone in the lobby or corridors of the building.

Mr. Bernard Nosker, a branch manager for the San Francisco Examiner, was driving north in a delivery truck on

Laguna towards Haight Street on the same morning. When he arrived at the corner of Laguna and Haight he heard a woman screaming with her head out the window. He drove in front of the building and stopped. She was shouting "fire." Nosker saw no evidence of fire or smoke but immediately backed up his automobile to the corner and turned in a fire alarm at the corner of Laguna and Haight. He returned to the building and with the aid of his helper began ringing the doorbells of the individual apartments. The battalion chief arrived within three or four minutes in a coupé. Upon observing the extent of the fire he transmitted a greater alarm immediately. The battalion chief stated that he received the alarm at 5:12 a. m.

Frank Kelly, Chief of the Division of Fire Prevention and Investigation of the San Francisco Fire Department, arrived at the fire about 5:30 a. m. on the day of the fire. He examined the premises several times after that. He stated that the point of origin of the fire was in the lobby of the apartment house. In his opinion the fire originated in two separate places in the lobby. One fire originated in the storeroom in the northwest section of the lobby area, and the other originated in the passageway between the west side of the storeroom and the stairway extending from the passageway to the second floor. In Kelly's opinion the fire was of incendiary origin. He based this opinion on several facts and observations including the following: (1) the point of origin; (2) the rapidity with which the fire burned; (3) the damage done to the surrounding partitions; (4) the separation of the two points of origin on opposite sides of heavy partitions; and (5) several holes burned in the first floor which indicates some volatile substance was sprayed on the floor.

The lobby was a comparatively large room and at one side was a solid wood counter with a pencil sharpener fastened to it. Across the lobby was the elevator and the stairway which extended to the roof. Next to the stairs was a room which had monk's cloth curtains extending across the front of it. This room was used as a storeroom and contained miscellaneous objects stored there by the tenants. Mrs. Monroe, one of the lessees of the building, testified that to her knowledge there was no paint thinner in this room.

There was a toolroom off the lobby in an area referred to as an annex. Mr. Monroe had formerly been a paint contractor and among other things kept his painting supplies including paint thinner in this toolroom. The room had

been kept padlocked for at least two years before and there was only one padlock key which was kept in the possession of the Monroes.

Francis J. Ahern, a police inspector in charge of the homicide detail of the San Francisco Police Department, was called upon to investigate in the course of his official duty because eight people had lost their lives in the fire. He first saw the appellant in a service station at which he worked on the night of Wednesday, July 25. He asked appellant to come down to the hall of justice to answer some questions and the latter followed in a truck. Appellant said in the statement, which was read at the trial by the interrogator and witness Ahern, that he delivered papers on the morning of the fire to 214 Haight Street around 3:30-3:40 a. m. Appellant had a key to the front door of the apartment house so that he could deliver the papers directly to the individual apartments. He did not see any fire or smell any smoke or any volatile liquid during the time that he was in the building. Appellant first heard about the fire about 6:30 or 7 on the same morning when it was necessary for him to return to the same area to deliver a paper that he had forgotten to deliver on his regular rounds. The newspaper route on which the appellant was working belonged to Russell Hardy. Appellant had been helping Hardy out for about a month prior to the fire and on the morning of July 22 the appellant delivered the route by himself. On Sundays the papers were usually picked up about 4:30 a. m. and it took from two to two and a half hours to deliver the entire route.

On the afternoon of the day following the first interview with appellant, Inspector Ahern interviewed him a second time. Appellant stated that he lighted a cigarette with a lighter on the fourth floor. He returned to the lobby and went behind the counter located there in order to look for a pencil with which he could write down charges in the route list. He found no pencil. He left the counter and crossed the lobby to the spot where the drapes were hanging. He looked behind the drapes and admitted that he would have taken anything he found if he could have used it. In the meantime his cigarette had gone out so he attempted to relight the cigarette while standing in the room or closet. He was standing "half in and half out" of the drapes and when he lit the cigarette with the lighter the drapes caught fire with a "poof." He became frightened and ran out of the building. Appellant noticed later that the jacket he was wearing that morning had a burned

hole on the shoulder which was not there before the fire. He told no one that he had started the fire. After leaving the building he delivered some more papers. After that he went to a coffee shop in order to figure what to do. He decided to go out to Hardy's house. He told Hardy that he needed help with the route. They finished delivering papers and also looked at the fire.

The police found the cigarette lighter in an automobile with the partially burned jacket. It was determined that the burned hole in the right shoulder had been caused by a cigarette and not by the fire.

As a result of this statement by appellant he was booked on the charge of manslaughter.

The next day Skinner was taken to 214 Haight Street where another statement was made by appellant. He repeated the same explanation of the cause of the fire that he had given the day before at the hall of justice, that is the fire started accidentally when he lighted his cigarette.

Inspector Ahern again interviewed appellant on Monday, July 30. Appellant's mother was present at the interview. The Inspector told the mother that he did not believe appellant's version of what happened. Mrs. Skinner then asked her son if he was afraid to tell the truth due to the fact that many people lost their lives in the fire. The appellant stated that he was afraid on account of the lives that had been lost. Mrs. Skinner told appellant to tell the whole truth and not a half truth. As a result appellant stated that he deliberately set the fire. He knocked down and broke a jar of fluid that smelled like paint thinner while he was rummaging around in back of the drapes. He stooped down, cupped it in his hand on the floor and threw it around and lit it.

Later that same day appellant made a confession. He stated that he had delivered the newspapers, he came downstairs and snooped around the lobby and the closet with the drapes hanging in front of it. While snooping in the closet he knocked over two quart mayonnaise jars of paint thinner that were located in the cabinet in back of the shelf. Appellant got a crazy idea to see how the curtain would burn so he splashed the fluid that was in a puddle on the floor over the curtains. Then he lit the drapes with his lighter. He splashed the fluid by swinging his hand through the puddle and following through to the curtain. He stated that his reason for saying that the fire started accidentally in his

previous statements was that he did not mean to kill the people and did not want to get charged with the murders. He admitted that it was not true that his jacket caught on fire when he ignited the curtains. He stated that his version of what happened as given in his previous statements was true except that the fire was deliberately set and did not start accidentally.

Appellant also gave a statement to the district attorney shortly after the statement referred to above was taken by Inspector Ahern. Skinner made substantially the same confession. He scooped up the fluid that spilled on the floor in the palm of his hand and got about one-half pint on the drapes. The drapes were light colored, soft textured, and felt sort of hairy. He admitted that his previous stories were false and that he decided to tell the truth when his mother was present with Inspector Ahern. He said, "I just got tired of lying."

Appellant testified before the grand jury and again gave substantially the same story that is stated above. That is, he admitted snooping in the closet, knocking over the jars, splashing the fluid on the curtains and lighting them. He became frightend and ran outside but he thought the blaze was dying out when he left the lobby. His motive remained the same: "I just got a crazy notion all of a sudden." He lit the fluid because he thought "it would go out and they would have a minor mystery about how the curtain burned."

Appellant's counsel objected to the introduction of the above extrajudicial statements on the ground that they were not freely and voluntarily given. There was an extensive *voir dire* examination of Inspector Ahern before he was allowed to read the statement made by appellant on July 26. This is the statement in which Skinner admitted that he accidentally started the fire. The room in which the statement was taken was approximately 20 by 14 feet in area. Besides the appellant and the inspector there were several men in the room including the district attorney, chief assistant district attorney, the fire marshal, three inspectors of police, and a police reporter. The interrogator did not tell Skinner that if the fire was an accident he was guilty of no crime. The inspector did not recall anyone else stating to Skinner that if the fire was an accident it would not be a crime. The inspector did not tell appellant that he would be kept there until an admission was got out of him one way or another. There is no evidence from the transcript that

the appellant was subject to any duress nor was he promised any immunity. Before the extrajudicial statements were allowed in, in which Skinner admitted deliberately setting the fire, appellant's counsel extensively examined all those present including appellant on *voir dire*. With the exception of Skinner none of those questioned indicated that appellant was subjected to any duress or physical coercion. Skinner testified that he had nothing to do with the fire nor did he see any fire when he delivered the papers to the apartment on the morning of July 22, 1951. He was informed that if he accidentally caused the fire no crime was committed and the police would have to let him go. When he was informed of this he admitted that he accidentally caused the fire although this was not true. That evening Skinner was put in the juvenile tank and during the night the lights were turned off and on. Early the following morning he was awakened and questioned by some man. After he left another man pulled up a chair outside the cell and remained there looking at him until the homicide inspectors came in. The same thing happened on the following morning. He admitted that he deliberately set the fire because he was at the point that he would say anything just so they would leave him alone. The police also seemed to have turned his mother against him. He testified that he lied when he admitted deliberately or accidentally setting the fire. Skinner did not understand the admonition that was read to him by the foreman of the grand jury before he testified before them. He testified that he was confused because he was informed that he did not have to testify but that if he did his statements could be used against him. The foreman of the grand jury read the admonition to the appellant at the end of which Skinner stated he was willing to testify.

There was more *voir dire* examination before the testimony before the grand jury was read.

Testimony was introduced by the district attorney that rebutted Skinner's statements that the lights were turned on and off during the night and that a man sat outside the cell and stared at him every morning during his stay in the juvenile tank.

Appellant's main contention is that his extrajudicial statement in which he stated that he accidentally set the fire should not have been admitted without requiring preliminary proof that it was freely and voluntarily made, with full opportunity on *voir dire* to explore that question.

While no such claim was made in his opening brief, in his closing brief and on oral argument appellant argued that these statements constituted a confession of the crime of murder, because of appellant's admission that he went into the room behind the curtain to see if there was anything worth while taking; that he was prowling and if he had seen anything in there which he could have used he would have taken it. Appellant argues that this constituted an act of burglary and that the deaths resulting therefrom would consequently constitute murder by statutory definition. No such objection was made in the trial court, and more important the jury was not instructed by the judge on what constitutes the crime of burglary although in one sentence the prosecuting attorney in his argument stated that he expected the judge to give such an instruction. Since the jury was not instructed on that theory it could not have found appellant guilty of murder on the theory that the deaths occurred in the commission of a burglary. Under these circumstances, in the absence of a specific objection that the statement constituted a confession of murder because it contained an admission of burglary, we cannot find any prejudice to appellant on that theory.

The more serious argument is that in any event these statements amounted to confessions of manslaughter, an included offense of which the jury in fact found the appellant guilty. Appellant concedes that no objection was made in the trial court on this ground; but he argues that a timely and sufficient objection is not necessary where a fundamental matter of public policy is involved, citing *People* v. *Rodriguez*, 58 Cal.App.2d 415, 421 [136 P.2d 626].

The only question presented to the trial court by counsel for appellant was whether the statement of the accidental setting of the fire, taken with appellant's later confessions of murder, was part of a confession of murder. Having pointed the trial court's attention so specifically to this question appellant should not now be permitted to raise another objection which occurred to no one during the trial and which appellant's counsel by his own conduct directed the attention of the trial judge away from, by the specific objection (abandoned on this appeal) that the statement together with appellant's later ones was an integral part of a confession of murder.

We hold this the more readily since before the trial was concluded the circumstances surrounding and preceding

the telling of the "accident" story by appellant were placed before the jury. It has been held that the failure to require the laying of a proper foundation for a confession "is without prejudice if the proof is subsequently introduced." (8 Cal.Jur., Criminal Law, § 205, p. 116.)

Appellant testified that he gave the "accident" statement because Inspector Jorgensen told him that he would be charged with murder if he did not admit that he set the fire accidentally, but if he did admit that he set it accidentally he would not be charged with anything. Inspector Jorgensen, called in rebuttal testified: "The exact conversation I do not recall. . . . As I recall there was no such conversation." Appellant argues that this amounted to no more than a statement that the witness did not remember whether or not such a conversation took place. In this we believe the appellant is putting too narrow a construction on the testimony. "As I recall" does not mean "I do not recall," but rather "as I recollect it" or "as I remember it." It was for the jury to weigh this statement and to give it such effect in contradiction of appellant's testimony as they found it entitled to.

■ The jury was correctly instructed that: "A confession is a statement . . . by one who is a defendant in a criminal trial . . . by which he acknowledged certain conduct of his own that constitutes *a* crime for which he is on trial . . .." We have emphasized the indefinite article: "*a* crime," not "*the* crime." From the court's other instructions the jury knew that appellant was on trial for manslaughter as an included offense. ■ The jury was further instructed correctly: "An admission is something less than a confession, in that it . . . does not alone, even if true, support a deduction of guilt." ■ The jury was also correctly instructed that: "The jury, before it may take a confession into consideration, must for itself find whether or not it was a voluntary confession. If the jury concludes that a confession was not made voluntarily, it is the duty of the jury to entirely disregard the same and not consider it for any purpose."

When it came to consider the crime of manslaughter these instructions told the jury that it could not consider any extrajudicial statement of appellant "by which he acknowledged certain conduct of his own that constitutes" the crime of manslaughter, if it concluded that it was not freely and voluntarily made. On all the facts of this case we can find

no prejudicial error in connection with the admission of the "accident" story.

Appellant's second contention on appeal is that the trial court erred in refusing to permit certain experiments to be performed in front of the jury and in refusing to permit testimony of certain experiments performed outside the presence of the jury.

There are four series of experiments which the trial court refused to allow the defense to perform in the courtroom and in some cases refused to allow testimony of the results of such experiments.

The first series of experiments involved the igniting of monk's cloth, the material out of which the drapes were made, in order to determine if the material would go "poof" as stated by appellant. It was tried first without the benefit of paint thinner and then it was tried with a piece of cloth soaked in the solvent. The expert witness for the defense was allowed to testify that the normal reaction on the burning of monk's cloth with a volatile substance on it would be that it would catch fire but not go off with a "poof." Without the benefit of a volatile substance, the monk's cloth would not ignite with a "poof." The expert witness was not allowed to testify what the actual results of his own experiments with monk's cloth were for the reason that the cloth used in the experiment could not be shown to be similar in age, weave, etc., to the cloth that was ignited at the source of the fire.

Another series of experiments involved the dropping of sealed quart mayonnaise jars containing water equivalent in weight to a quart of paint thinner from a height of 3 and 6 feet. This experiment was done in order to ascertain whether or not the glass would break and if so the size of the pieces of glass and how far the pieces would spread. The purpose of the experiment was to show (1) the glass invariably broke, and (2) it would have been impossible for the appellant to scoop his hands through the solvent without cutting himself. The trial court did not allow any testimony on the results of such experiments nor did he allow the witness to perform the experiment in court in front of the jury. The court's reason for refusing to admit such testimony or allow such an experiment was based on the lack of knowledge of the type of glass in the container, the amount of fluid in the containers, the exact manner in which they fell from the shelf, etc. In short, there were too many

variables to allow in such testimony or experiments. But the witness was allowed to testify of the breaking propensities of glass containers filled with fluid as contrasted with an empty container.

Another experiment was the pouring of paint thinner on a hardwood floor in order to see how rapidly it would spread and whether it would remain in a puddle. The expert witness was allowed to testify that the fluid would spread evenly on a level floor to about the thickness of a dime.

Another group of experiments concerning the burning of paint thinner on a pine floor in order to demonstrate that paint thinner would not burn through the flooring. Like the others the court refused to allow the performance of this experiment in the presence of the jury. The witness was allowed to testify to the results of an experiment in which he ignited paint thinner spread out on an oak floor. None of the wood was burned, and the fire had a slight bleaching effect only, turning the surface black at the most. The results of this experiment were introduced primarily to rebut the fire inspector's testimony that he observed charred spots in the toolroom that indicated some volatile substance had been burned there.

In *People* v. *Ely*, 203 Cal. 628, 633 [265 P. 818], the court had this to say about the type of testimony designated as experiments: ''The reception or rejection of such testimony lies largely within the discretion of the trial court, with this limitation—that it must be shown that substantially the same conditions existed, and further that the evidence shall be of such a character as to aid rather than to confuse the minds of the jurors with collateral matters.'' Today it is fundamental law that it is within the sound discretion of the trial court to determine whether or not an experiment will aid or confuse the jurors. (*People* v. *King*, 104 Cal. App.2d 298, 307 [231 P.2d 156].)

Applying this principle to the facts here we can find no abuse of discretion. The experiments were of primary importance in relation to the extrajudicial statements. Appellant argues that these experiments if performed in front of the jury would illustrate in a much more forceful manner the physical impossibility that the fire began as appellant stated than by merely relating to the jury the results of such experiments. It should be noted that none of these experiments help to establish that appellant did not set the fire. There was no way for the trial court to determine if the

experiments were performed under similar conditions. The apartment house was demolished, and there were too many variables that would offset any value that might result from performance of such experiments, for example the degree of smoothness of the floor or lack of it. If such experiments had been allowed to be performed in the courtroom, it would have unduly emphasized the inconsistencies of appellant's story without first establishing similar conditions. The inconsistencies also go to collateral facts and do not help to rebut the admission of the basic fact—that he started the fire.

Appellant cites and relies on two cases to support his contention that the court abused its discretion in failing to allow the performance of the experiments. In *People* v. *Freeman*, 107 Cal.App.2d 44 [236 P.2d 396] the court held that it was not an abuse of discretion for the trial court to allow the prosecution to show motion pictures of an experiment conducted by officers under similar conditions demonstrating the physical fact that matches will stay lighted after being tossed from a moving automobile. Appellant argues that if it is not an abuse of discretion to allow such evidence on behalf of the prosecution, it is an abuse of discretion to fail to allow a similar type of evidence in this case on behalf of defendant. As pointed out by respondent the case is not directly in point. The Freeman case cannot be said to stand for the proposition that a failure to allow such evidence would have been an abuse of judicial discretion. Judicial discretion has a wide range within which to swing, and to be an abuse of discretion there must be no logical reason for the court's action.

The other case, *People* v. *Halbert*, 78 Cal.App. 598 [248 P. 969], is even less in point since it dealt only with the failure to allow evidence of experiments, not the refusal to permit experiments in the courtroom. At pages 607-608 of that case the court held that evidence of experiments should only be admitted where the conditions are substantially identical. We can find no abuse of discretion in the trial court's rulings.

Judgment and order denying a new trial affirmed.

Nourse, P. J., and O'Donnell, J. pro tem.,* concurred.

A petition for a rehearing was denied March 24, 1954, and appellant's petition for a hearing by the Supreme Court was denied April 7, 1954.

---

*Assigned by Chairman of Judicial Council.