EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* EFRAÍN LEBRÓN LÓPEZ, acusado y apelante.

Números: CR-66-250, CR-66-251, CR-66-252          Resueltos: 26 de junio de 1968

Enrique Miranda Merced, Edna Abruña Rodríguez y E. Armstrong de Watlington, abogados del apelante; J. B. Fernández Badillo, Procurador General, e Irene Curbelo, Procuradora General Auxiliar, abogados de El Pueblo.

PER CURIAM: Efraín Lebrón López fue acusado y convicto ante jurado por la comisión de tres delitos: asesinato en primer grado, atentado a la vida e infracción a la Ley de Explosivos (Art. 12, 25 L.P.R.A. sec. 492). Según la prueba desfilada, el acusado en unión con Benjamín del Valle y Ma-

nuel Medina Rucci concertaron y planearon la muerte de Ramón Elías Cancel, colocando en la noche del 2 de octubre de 1963, una bomba de tiempo de manufactura casera debajo del asiento del conductor del automóvil, perteneciente al referido Elías Cancel. Dicha bomba explotó a las 7:00 de la mañana siguiente. Resultó muerto Elías Cancel y herida una invitada llamada María Isabel Villegas. El fiscal trajo prueba para establecer que la motivación del crimen fue el fallo absolutorio dado en el caso en que Elías Cancel fue acusado de atentado a la vida y portación de armas como resultado de un incidente ocurrido entre él y el acusado en este caso. Levanta en apelación la comisión de nueve errores por el tribunal sentenciador a saber:

"*Primer Error:* Erró el Honorable Tribunal de Instancia al permitir al Ministerio Público que probara el resultado de los procedimientos que anteriormente se habían seguido en Humacao contra Ramón Elías Cancel y Efraín Lebrón López, por medio de prueba secundaria sin que se demostrara que no se había podido conseguir la mejor evidencia.

*Segundo Error:* Erró el Honorable Tribunal de Instancia al variar el orden lógico de la prueba para permitir al Ministerio Público presentar evidencia de supuestas manifestaciones extrajudiciales de un alegado coconspirador sin que previamente se estableciese que al momento de hacerse las alegadas manifestaciones estaba vigente una conspiración y eran en ayuda de la misma.

*Tercer Error:* Erró el Honorable Tribunal de Instancia al no resolver que las alegadas manifestaciones extrajudiciales de Benjamín del Valle Cruz, supuesto coconspirador, no eran admisibles contra Efraín Lebrón López, y al no instruirlo así al jurado.

*Cuarto Error:* Erró el Honorable Tribunal de Instancia al no resolver que no se había probado la alegada conspiración y al no instruir al jurado sobre ese extremo.

*Quinto Error:* Erró el Honorable Tribunal de Instancia al reservarse el fallo sobre la moción de absolución perentoria presentada por la defensa por el fundamento de que no se había corroborado la declaración del alegado cómplice de manera que

se conectara al acusado con los delitos imputados y al no declarar con lugar dicha moción.

*Sexto Error:* Erró el Honorable Tribunal al permitir al Ministerio Público invadir el terreno de lo reservado al jurado por medio de supuestas preguntas hipotéticas y sus contestaciones.

*Séptimo Error:* Erró el Honorable Tribunal de Instancia al permitir al Ministerio Público que realizara un impresionante experimento delante del jurado, so pretexto de ilustrar el testimonio hipotético de un perito, sin que ello estuviese justificado por la prueba.

*Octavo Error:* Erró el Honorable Tribunal de Instancia al admitir los veredictos aun cuando los mismos eran contrarios a la prueba y contrarios a derecho.

*Noveno Error:* Erró el Honorable Tribunal de Instancia al impartir las instrucciones al jurado."

■ 1—Alega el apelante que erró el tribunal a quo al permitir al Ministerio Público probar el resultado de los procedimientos que anteriormente se habían seguido en Humacao contra Ramón Elías Cancel, por medio de prueba secundaria sin que se demostrara que no se había podido conseguir la mejor evidencia. Se refiere el error levantado al testimonio vertido por la testigo Selenia González Vda. de Elías en relación a que Elías Cancel fue declarado inocente en el proceso criminal celebrado en su contra el 4 de septiembre de 1963. Al respecto también declaró el testigo de defensa, Margaro Lebrón, quien además declaró que el acusado, Efraín Lebrón, fue convicto por un delito de portar armas al ser juzgado por hechos relacionados con el mismo incidente que dio lugar al proceso contra Elías Cancel. Declaró este último testigo lo siguiente a preguntas de la defensa:

"P. ¿Usted conoce a Efraín Lebrón?
R. Lo conozco.
P. ¿Qué relación tiene con Efraín?
R. Es mi hijo.
P. ¿Usted conocía a Elías Cancel?
R. Sí, como no.

P. ¿Usted recuerda algún incidente que ocurriera con ese señor?

R. Sí, señora, como no.

P. Con motivo de ese incidente, ¿usted tuvo que acudir a algún sitio?

R. Tuve que ir a la Corte cada vez que él asistía a la Corte durante el proceso, pues, yo iba con él.

P. ¿Durante el proceso con quién, digo, de quién?

R. De Elías Cancel.

P. ¿De Elías Cancel?

R. Ajá.

P. ¿Y qué relación tenía su hijo Efraín en ese proceso?

R. Que él era el que, él, de manera que el otro era el acusado de un caso.

HONORABLE JUEZ:

P. Testigo, al decir, que el otro, a quien se refiere?

R. Al otro señor.

P. ¿Cómo se llama él?

R. Elías Cancel.

P. ¿Qué Elías era qué?

R. El acusado.

LIC. CRUZ:

P. ¿Y Efraín?

R. Efraín era testigo.

P. ¿En ese proceso que usted acaba de mencionar?

R. Sí, señora.

P. Durante el día que se celebró ese proceso, ¿dónde estuvo usted?

R. En Sala, en la Corte.

P. ¿Con quién estuvo?

R. Con él.

HONORABLE JUEZ:

P. ¿Con quién?

R. Con Efraín Lebrón. (Ver T. de E. de 25 de nov. de 1964 págs. 603–604)

.        .        .        .        .        .        .        .

SEÑOR FISCAL: [Lic. Juan]

P. ¿Es o no cierto que como consecuencia de ese incidente que usted dice, acusaron a su hijo también?

R. Resulta, que usted quiere decir, qué si yo . . . a él lo acusaron también?

P. No, señor, la pregunta mía, aparentemente, no la entendió, usted dice que entre su hijo y Cancel hubo un incidente.

R. Sí, señor.

P. Y como consecuencia de ese incidente, acusaron a Cancel.

R. Sí, señor.

P. Y la pregunta si como consecuencia de ese mismo incidente, en que acusaron a Cancel, es o no cierto que acusaron a su hijo.

R. De portar armas.

P. Entonces, la otra pregunta que yo le voy a hacer, ¿cuál fue el resultado de ese juicio de Cancel?

R. El resultado de ese juicio, que lo absolvieron, la Corte.

P. ¿Y el juicio de su hijo?

LIC. LÓPEZ CARRILLO:

Objeción, porque el resultado del juicio se prueba si hay algún resultado con la certificación de una sentencia del Tribunal, si hay sentencia.

HONORABLE JUEZ:

Sin lugar.

SEÑOR FISCAL: [Lic. Juan]

P. ¿Cuál fue el resultado de ese juicio de su hijo?

R. El resultado del juicio de mi hijo de la portación de armas, se vio en Corte.

P. ¿Y cuál fue el resultado?

R. Lo hicieron culpable de portar armas.

SEÑOR FISCAL:

Nada más con el testigo, Vuestro Honor.

HONORABLE JUEZ:

Defensa.

LIC. LÓPEZ CARRILLO:

P. ¿Usted sabe si lo han condenado de ese delito, de alguno?

R. No, señor.

P. Usted, sabe, el fiscal le preguntó, si mientras el fiscal Bird preparaba la prueba, su hijo habló con él, ¿usted sabe si el fiscal Bird preparó la prueba en ese caso de Cancel?

R. No sé de eso.

P. ¿No sabe si Bird preparó la prueba en el caso que Cancel salió absuelto?

R. No sé cómo la prepararía, sabe, yo sé que salió absuelto.

P. ¿Y usted sabe el incidente, de que tuvo que ver?, ¿qué le pasó a su hijo en el incidente?

R. El hijo mío, Elías Cancel le había pegado cuatro tiros a él.

P. ¿Por dónde?

R. Por la espalda.

P. ¿Y salió absuelto Cancel?

R. Sí, señor." (Ver T.E. de 28 de nov. de 1964, págs. 608–611)

Entendemos que si algún error se cometió, éste quedó subsanado por la declaración del testigo de defensa, Margaro Lebrón, sobre la materia objetada.

2, 3, 4—Discutiremos en conjunto el segundo, tercero y cuarto error por relacionarse los tres con la conspiración alegada por el fiscal. Sostiene el apelante que erró el tribunal de instancia al variar el orden lógico de la prueba al permitir que el fiscal trajera a declarar a la testigo Lydia Sánchez, sobre las manifestaciones extrajudiciales dichas a ésta por Benjamín Cruz en presencia del acusado, sin que previamente se estableciese que al momento de hacerse las alegadas manifestaciones estaba vigente una conspiración y eran en ayuda de la misma. Ya en el caso de *Pueblo* v. *Beltrán*, 18 D.P.R. 944 a la pág. 948 (1912) dijimos al respecto:

". . . El orden de la prueba es discrecional en la corte aun en los casos de conspiración, como se ve en la siguiente cita:

'Después de haberse presentado prueba tendente a probar una conspiración no era necesario que se demostrara que en realidad la conspiración se había formado, antes de que puedan probarse las declaraciones de cualquiera de los conspiradores. Si la conspiración no se prueba finalmente, deberá hacerse caso omiso de dichas declaraciones. Está confiado en gran parte a la discreción de la corte el determinar la prueba que ha de exigirse acerca de la existencia de la conspiración antes de que se admita prueba de los actos y declaraciones de uno de los su-

puestos conspiradores en ausencia del otro. (*People* v. *Daniels,* 105 Cal. 262, 265; 36 Pac. Rep. 720).

Aunque la regla general es que no se admitirá ninguna declaración de los conspiradores hasta que no se haya establecido primeramente la conspiración, la corte puede variar el orden de la prueba en cuanto a este particular, pues ese precepto no es imperativo; y siempre que las circunstancias lo justifiquen la acción de la corte variando dicho orden será aprobada. (*People* v. *Donnolly,* 143 Cal. 394, 398, 77 Pac. Rep. 177).' "

Más tarde en el caso de *Pueblo* v. *Díaz,* 22 D.P.R. 191 (1915) a la pág. 205 dijimos:

"Dichos errores b y c envuelven la queja de que se permitió que Ramón Jiménez declarase sin que antes se hubiera presentado prueba independiente de la existencia de la conspiración. Sin embargo, el orden en las pruebas es discrecional en la corte, con mayor razón cuando el juicio se celebra sin jurado como ocurrió en este caso, y si bien es cierto que por regla general antes de que se permita a un co-conspirador que declare sobre actos y conversaciones de sus co-conspiradores se exige prueba independiente de la comisión del delito de conspiración, no es tan absoluta esa regla que el juez no pueda alterarla . . . ."

En California en donde se regula el orden de la prueba en los casos de conspiración, se ha llegado a la misma conclusión. *People* v. *Crompton,* 123 Cal. Rptr. 403 (1899) ; *People* v. *Henry,* 86 C.A.2d 785, 195 P.2d 478 (1948) ; *People* v. *Griffin,* 98 C.A.2d 1, 219 P.2d 519 (1950). Véase además, 2 Wharton, *Criminal Evidence,* sec. 442, pág. 219 (1955) ; I Conrad, *Modern Trial Evidence, Vicarious Admissions,* sec. 523, pág. 420 (1956).

■ Como podemos ver claramente queda a la sana discreción del tribunal de instancia el alterar el orden de la prueba máxime cuando la prueba del caso está tan interrelacionada que resulta prácticamente imposible separarla. Tal es la prueba del caso de autos.

■ Debe tenerse presente que una cosa es probar el delito de conspiración y otra el establecer una conspiración como

requisito previo a la admisión de las manifestaciones extrajudiciales de un co-conspirador.

En el caso de *State* v. *Thompson*, 139 N.W.2d 490 a la pág. 502 (1966) se dijo:

" '. . . No era por lo tanto necesario probar la conspiración más allá de toda duda razonable, prueba prima facie era todo lo que se requería para admitir en evidencia los actos y declaraciones de un coconspirador hechos para la consecusión de un designio común con el propósito de implicar a cualquier otro coconspirador . . . .' La diferencia entre probar una conspiración como delito, donde se requiere prueba más allá de toda duda razonable, y el establecer una conspiración como un prerequisito para la admisión de las manifestaciones de un alegado coconspirador donde prueba prima facie es suficiente, es una distinción que debe tenerse en mente."

■ Ataca el apelante además el que se admitieran las manifestaciones extrajudiciales hechas por Benjamín del Valle a Lydia Sánchez por ser éstas prueba de referencia. Las manifestaciones en cuestión fueron vertidas por Benjamín en los momentos en que Lydia fue a abordar el carro del acusado. Según la transcripción de evidencia los hechos fueron los siguientes:

"LIC. JUAN: [Señor Fiscal]

Entonces . . . .

P. Dice usted que allá para el dos de octubre, a eso de las diez y diez y media de la noche, usted vio al señor Benjamín del Valle?

R. Sí, señor.

P. ¿Y vio al señor Efraín Lebrón?

R. Sí, señor.

P. ¿Vio a alguién más que le llamara la atención en ese momento?

R. Manolín estaba con ellos.

P. ¿Manolín Medina?

R. Sí, señor.

P. ¿Y dónde fue que usted los ve por primera vez?

R. En el Bar El Alcázar, donde yo trabajo.

P. Cuando usted dijo, en el día de ayer, que Benjamín la había invitado a ir a su apartamiento, dijo que era en la segunda visita que había hecho Benjamín al Bar El Alcázar?

R. Sí, señor.

P. ¿Fue al apartamento?

R. Sí, señor.

P. ¿En qué vehículo fueron al apartamiento?

R. En el carro de Efraín.

P. ¿De Efraín?

R. Sí, señor.

P. ¿Y se refiere al señor acusado?

R. Sí, señor.

.   .   .   .   .   .   .   .

P. ¿Quiénes iban en el vehículo?

R. Manolín, Efraín, Benjamín y yo.

P. Cuando se fue a montar en dicho vehículo, al salir del Bar El Alcázar, ¿qué le pasó que le llamara la atención?

.R. Cuando me fui a montar a la parte de atrás, había un paquete en el piso.

P. O sea, ¿en el piso, en la parte de atrás del vehículo que ustedes iban?

R. Sí, señor.

P. ¿Y qué sucede, si sucede algo, cuando se va a montar, con relación a ese paquete?

R. Cuando me fui a montar, lo iba a pisar y Benjamín me dijo . . .

Lic. López Carrillo:

Un momentito, ahí nosotros vamos a objetar.

Honorable Juez:

Con lugar la objeción en este momento.

Señor Fiscal: [Lic. Juan]

P. Cuando ustedes se iban a montar en dicho vehículo, ¿quiénes estaba ya dentro del vehículo, si alguién estaba?

R. Manolín y Efraín.

P. ¿Y dónde estaba Efraín en el vehículo?

R. Efraín iba en la parte de acá.

P. Cuando dice en la parte de acá, a qué parte, la parte del conductor?

R. El era el que iba de chófer.

P. ¿Se refiere a Efraín?

R. Sí, señor.

P. ¿Al señor aquí acusado?

R. Sí, señor.

.  .  .  .  .  .  .  .

P. Cuando usted va entrando, testigo, le pregunto, qué sucedió, si algo sucedió, al usted entrar, qué observó?

R. Vi el paquete en el piso.

P. Y qué sucedió con relación a ese paquete, si algo sucede, cuando ve ese paquete y va entrando en dicho vehículo?

R. Cuando voy a entrar al vehículo, trato de pisarlo y Benjamín me dice . . .

Lic. López Carrillo:

Objeción. . . .

Honorable Juez:

Con lugar la objeción en este momento.

Señor Fiscal: [Lic. Juan]

P. Testigo, cuando usted dice que va a pisar ese paquete, dónde estaba Efraín en ese momento?

R. Estaba en el asiento de alante.

P. ¿Del vehículo?

R. Sí, señor.

P. ¿Y el paquete, dónde estaba?

R. En la parte de atrás.

P. ¿En el mismo vehículo?

R. Sí, señor.

P. Y cuando va a pisar ese paquete, ¿qué sucede, si algo sucede?

R. Pues, Benjamín me dice. . . .

Lic. López Carrillo:

Objeción.

Honorable Juez:

Sin lugar la objeción.

"Lic. Juan: [Señor Fiscal]

P. ¿Qué sucede, si algo sucede, cuando usted va a pisar ese paquete?

R. Benjamín me dice: 'cuidado si lo vas a pisar, que va y explota y nos jodemos todos', me dice Benjamín a mí." (Véase T.E. de 24 de noviembre de 1964 a las págs. 453-457.)

Señala el apelante que tales manifestaciones no formaban parte del *res gestae,* no constituían admisiones por silencio, no eran imputables al acusado bajo la doctrina de manifestaciones de co-conspiradores y no eran la mejor evidencia. Entendemos que no erró el tribunal sentenciador al admitir tales manifestaciones extrajudiciales. El tribunal sentenciador fue sumamente meticuloso exigiendo prueba de dónde estaba el acusado en los momentos de éstas hacerse. Creemos que tales manifestaciones eran admisibles por el fundamento, de que cumplían con los requisitos de manifestaciones extrajudiciales de un co-conspirador según lo establecimos en el caso de *Pueblo* v. *Castro,* 75 D.P.R. 672 (1953) a la pág. 680:

"Las actuaciones y las manifestaciones extrajudiciales de co-conspiradores—o de coacusados que cometen un delito con un designio común—son admisibles en evidencia contra los otros acusados, siempre y cuando que (1) de los autos surja alguna evidencia independiente que conecte a éstos con la conspiración o el designio común y (2) las actuaciones y las manifestaciones de los coconspiradores haya ocurrido durante el curso y en ayuda de la conspiración."

Haciendo un análisis de la prueba desfilada encontramos que hubo prueba suficiente de la existencia de una conspiración. A continuación pasamos a examinar la prueba cronológicamente. Declaró la esposa del occiso, Sra. Selenia González Vda. de Elías, quien testificó al respecto lo siguiente:

"SEÑOR FISCAL: [Lic. Oquendo]

P. Señora, a Efraín Lebrón López, lo vio usted en ese proceso?

R. Sí, señor fiscal.

P. ¿Qué, si algo, ocurrió en relación con Efraín Lebrón López que le llamara a usted la atención en el transcurso de ese proceso?

R. Que subiendo las escaleras del Honorable Tribunal, allí en Humacao, subiendo las escaleras oí cuando él dijo que si mi esposo, el señor Ramón Elías Cancel salía, lo sacaban absuelto, que él se iba a vengar por sus mismas manos de una manera u otra." (Ver T.E. de 18 de nov. de 1964, a la pág. 41.)

Luego declaró el Fiscal Bird a preguntas del fiscal:

"P. ¿Recuerda haber tenido alguna conversación con este señor?

R. Sí, señor, tuve varias conversaciones con él, específicamente en cuanto . . .

P. ¿Hubo alguna conversación que le llamara la atención?

R. Sí, en el receso de las doce se me acercó a mí y me preguntó que por que no le bajaban el caso de portar arma, artículo 8 a artículo 7, para que en vez de jurado, fuera el juez quien interviniese en el caso.

P. Y con posterioridad a eso, ¿recuerda haber tenido alguna conversación?

R. Bueno, al decirle a él que no podía hacer eso, porque el caso principal era el caso de atentado a la vida, y artículo 7 implicaba un arma descargada, y que así, automáticamente se caía el caso de atentado a la vida; que no me preocupara que él tenía que buscar la forma de vengarse, porque él sabía que iba a salir absuelto."

También declararo el testigo Emeterio Rivera Silva quien era el encargado del edificio en el cual se hospedaba Benjamín del Valle. Su testimonio estuvo relacionado con haber visto al acusado reunido frente a su carro con Benjamín y Manuel, en la Ave. Borinquen. Luego declaró Bartola Rucci quien declaró lo siguiente:

"P. ¿Durante cuánto tiempo estuvo el señor acusado en su casa?

R. El estuvo de un día para otro.

P. Debo entender, entonces, que durmió en su casa.

R. Durmió en una casa que yo cuidaba y yo le preparé una cama allí mismo, en la casa y él durmió allí.

P. Doña Bartola, si me permite, ¿dónde es su casa?

R. En Vieques.

P. ¿Ocurrió alguna cosa durante la permanencia de este señor acusado en su casa?

R. ¿Cómo qué?

P. Vamos entonces, a ver si somos más específicos. ¿Sabe usted a qué estuvo el señor acusado en su casa?

R. Bueno, él salió con mi hijo y cuando llegaron a mi casa, pues, éste, él se sentó en una silla.

P. ¿Quién es él?

R. Efraín Lebrón se sentó en una silla y Manuel Medina, mi hijo, le dio un frasco conteniendo una cosa amarilla, entonces, mi hijo se fue a darle agua a un potro que que tenía y yo le pregunté al señor Efraín, le pregunté a mi hijo qué era aquello, antes de irse, y me dijo . . .

.     .     .     .     .     .     .     .

P. ¿Con relación al señor acusado, ¿tuvo usted alguna conversación?

R. Tuve.

P. ¿Con el señor acusado?

R. Sí, señor.

P. ¿En qué consistió la conversación? .

R. Yo le . . . cuando . . . yo le dije a él que si para qué quería aquella dinamita, que estaba dentro de aquel frasco.

P. ¿Qué, si algo, le contestó el señor acusado?

R. Que la quería para pescar.

P. ¿Alguna otra cosa que hablara con el señor acusado?

R. Le dije que si él sabía tirar esa dinamita y él me dijo que sí, también, le dije que si dónde él pescaba y también, esa pregunta, no me la contestó porque se paró de la silla y se fue al balcón porque ya le había hecho otras preguntas, si tenía lancha, que si la lancha era de motor, y él me contestaba que sí, que tenía, pero, cuando le hice la pregunta a él que si dónde tenía la lancha se paró de la silla y se fue al balcón, no me la contestó y yo creí que era una pregunta, que yo era, una pregunta tonta.

.     .     .     .     .     .     .     .

HONORABLE JUEZ:

P. ¿Qué actitud, si alguna, mostraba el acusado mientras usted le preguntaba?

R. El se ponía como pensativo y siempre estaba mirando así, a lo largo, con un pensamiento largo, así." (Ver T.E. de 20 de nov. de 1964 a las págs. 236 a 239.)

También testificó el coautor Benjamín del Valle quien en síntesis declaró que él vivía en la Avenida Borinquen 1976, que al regresar de su trabajo la tarde del 2 de octubre de

1963, Efraín lo estaba esperando; que juntos subieron a su apartamiento y luego fueron hasta La Perla a buscar a Manuel. Luego de localizar a Manuel se fueron a comer los tres a un restaurant; que luego se dirigieron al Bar Alcázar y allí él concertó cita con Lydia Sánchez para ir a buscarla más tarde; que de allí se fueron a dar vueltas; que entonces buscaron a Lydia y se fueron los cuatro hacia su apartamiento. Una vez allí él subió con Lydia mientras que Efraín y Manuel lo esperaron abajo. Más tarde, juntos llevaron a Lydia y regresaron a su apartamiento; que allí Manuel y Efraín bregaron con unos instrumentos; que éstos eran una batería, un reloj (despertador) y un frasco con unas mechas; que luego de pasadas varias horas como a las 2:30 de la madrugada salieron hacia Humacao en el automóvil de Efraín. Al llegar allí se dirigieron a la Extensión Roig a la casa de Elías, que por indicaciones de Efraín supieron cuál era el carro, que Manolín abrió la puerta de éste y que él acomodó la batería, el reloj y el frasco de cristal debajo del asiento del chofer. Al finalizar la operación descrita regresaron a su apartamiento en San Juan. (Ver T.E. de 23 de noviembre de 1964, págs. 312 a 323.)

De lo expuesto surge que resultó probada una conspiración para matar a Elías Cancel siendo admisibles las manifestaciones extrajudiciales hechas por el co-conspirador Benjamín del Valle mientras ésta estaba vigente. No se cometieron el segundo, tercero y cuarto errores señalados.

▊ 5—Alega en primer lugar el apelante que erró el tribunal a quo al reservarse la resolución de la moción de absolución perentoria, ya que la Regla 135 de Procedimiento Criminal sólo concede esta facultad, luego de desfilada toda la prueba, pero no cuando se presenta la moción al terminar la prueba de una de las partes.[1] Señala en su alegato el

---

[1] Véase Regla 135 de Procedimiento Criminal (1963):

"De presentarse una moción de absolución perentoria luego de prac-

apelante, que tal práctica es perjudicial para el acusado. Se presta para que si la prueba de defensa crea una mala imagen, el juez someta al final el caso al jurado y éste lo falle impresionado por la prueba de la defensa. Si bien es cierto que no hubo objeción a tal actuación, coincidimos en que el tribunal sentenciador debió resolver tal moción en el momento en que se presentó. (2) Entendemos, sin embargo, que tal actuación no resultó perjudicial al acusado, máxime cuando la moción de absolución perentoria no procedía, ya que la declaración del cómplice Benjamín del Valle quedó plenamente corroborada. (3) Existía prueba en el récord que conectaba al acusado con la comisión del delito, sin tomar en consideración la declaración del cómplice. (4)

█ 6, 7—Sostiene el apelante que el tribunal sentenciador incidió al permitir: que el fiscal, a través del testigo Gilberto García Monje, invadiera el campo reservado al jurado. Alegó además que erró también al dejar que se celebrara un impresionante experimento en presencia del jurado. En primer lugar entendemos que en este caso el perito García Monje se limitó a explicar cómo él confeccionaría una bomba teniendo los materiales, que según la prueba desfilada, (5) fueron usados en este caso. No se invadió el terreno reservado al jurado. (6) Entendemos además, que el hecho de que

ticada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción bien antes del veredicto o después del veredicto o de disolverse el jurado sin rendir veredicto . . . ."

(2) Véase a 4 Orfield, *Criminal Procedure under the Federal Rules*, Regla 29, pág. 672 (1967).

(3) Véase análisis de la prueba, pág. 14.

(4) Ver Regla 156 de Procedimiento Criminal (1963).

(5) Ver testimonio del Sr. Israel Castellanos sobre los restos de pila seca (batería), de reloj despertador encontrados en el carro de la víctima. (T.E. de 20 de noviembre de 1964 págs. 145 a 218.)

(6) Véase VII Wigmore, *On Evidence*, sec. 1920, págs. 17–18.

"Una frase frecuentemente usada para explicar porqué el testimonio que nos concierne se excluye, enuncia que si al testigo se le permitiera expresar su 'opinión', sería usurpar las funciones del jurado.

"Esta frase se ha hecho para implicar una táctica ilícita o inmoral

se hubiere manifestado por el propio testigo que la confección de tal bomba no requería conocimientos especializados, no hacían de esta materia una de común y público conocimiento. El que sólo se requiera un conocimiento básico para confeccionar un tipo de bomba de tiempo (casera), como la usada en este caso, no puede crear una presunción de conocimiento en un jurado ordinario. La norma o criterio que rigen la admisibilidad de la evidencia de opinión según *Wigmore* es la siguiente:

"En la práctica, por lo tanto, cuando una inferencia es ofrecida, dos principios deben ser aplicados. Nosotros primero preguntamos. . . . ¿Es éste un tópico respecto al cual el testigo como tal necesite una experiencia especial sobre lo normal, y si así es, posee él tal? Cuando esta interrogante haya sido determinada en favor del testigo, nos preguntamos, ¿necesita el jurado alguna inferencia del testigo, ya sea por su habilidad o porque la data observada no puede ser reproducida adecuadamente por éste?" [7]

Este caso cumple con tal norma. En segundo lugar entendemos que no erró el tribunal a quo al permitir el experimento llevado a cabo por el perito García Monje, en presencia del jurado.

El juez de instancia antes de hacerse el experimento advirtió e instruyó debidamente al jurado de la siguiente forma:

"Compañero, entendemos que antes de continuar el Tribunal quiere instruir a las damas y caballeros del Jurado, que no tomarán en consideración ni asimilarán que la demostración que

---

en el testimonio de opinión del testigo.

"En este aspecto la frase es tan infundada y capciosa, que debe ser repudiada enteramente. Es una mera pizca de retórica vana. No hay tal razón para la norma ya que al expresar su opinión el testigo no está intentando usurpar la función del jurado; ni podría si así lo deseare. El no está intentando eso, porque su error (si alguno) meramente consiste en ofrecer al jurado un fragmento de testimonio que no debiera ir a él; y no podría usurparla aunque quisiera, porque el jurado aún podría rechazar su opinión y aceptar algún otro punto de vista y ningún poder legal, ni siquiera una orden del juez puede compelerlos a ellos a aceptar la opinión del testigo en contra de la de ellos."

[7] Wigmore, *On Evidence*, supra, pág. 23.

habrá de hacer el testigo fue lo que ocurrió en efecto; esta demostración servirá solamente y exclusivamente para aclararle las manifestaciones verbales que ha hecho el testigo en cuanto a la forma que él describe que pudo unirse los distintos elementos, a base de la pregunta que hizo el Ministerio Público; la demostración es para aclarar el testimonio que hizo el testigo hace breves instantes, pero, no deben en forma alguna asumir, de que efectivamente eso que está ilustrando el testigo, fue lo que ocurrió, ¿está clara la situación?" (Ver T.E. de 24 de noviembre de 1964, págs. 488–489.)

No encontramos que el tribunal sentenciador haya hecho un uso arbitrario de la discreción que en estos casos se le reconoce.[8] El experimento sólo se celebró para los efectos de demostrar la forma más simple y sencilla en que se pudieron haber unido los elementos envueltos en este caso, cuyos restos fueron hallados en el carro de la víctima. En California en un caso de conspiración para cometer actos de sabotaje, se permitió la celebración de un experimento para demostrar, como aquí, una reacción química, la Corte dijo:

"Se señala como error la acción de la corte en permitir a un perito, testigo del fiscal, conducir un experimento ante el jurado con el propósito de demostrar la reacción inflamatoria y otras propiedades peligrosas del potasio metálico. Se alega que no se sentaron las bases para la admisión de tal evidencia,

---

[8] El Art. 95 de la Ley de Evidencia de marzo 7 de 1905 dispone:

"Siempre que un objeto, perceptible a los sentidos, tuviere tal relación con el hecho controvertido, que proporcionare fundamento razonable para hacerlo creíble, o para constituir un factor no despreciable en el conjunto de la evidencia, dicho objeto podrá exhibirse al jurado o probarse mediante testigos, su existencia, situación y naturaleza. La admisión de esta clase de evidencia deberá regirse por el sano criterio del tribunal."

El Art. 1954 del Código de Enjuiciamiento Civil de California, del cual el artículo anterior fue copiado ha sido interpretado en el sentido de que se le concede al tribunal sentenciador discreción para permitir la celebración de experimentos ante el jurado. Ver *Willoughby* v. *Zylstra*, 5 C.A.2d 297, 42 P.2d 685 (1935); *Martin* v. *Angel City Baseball Ass'n*, 3 C.A.2d 586, 40 P.2d 287 (1935).

y además que no hay prueba de que tal substancia hubiere sido usada alguna vez por los conspiradores. El potasio metálico era admisible en evidencia ya que había sido identificado como la substancia que los conspiradores habían adquirido para usarla en ayuda de los propósitos de la conspiración. [cita] Estaba enteramente dentro de la discreción del tribunal sentenciador el permitir la evidencia del experimento, ya que fue conducido substancialmente bajo condiciones similares a las demostradas en evidencia y el resultado del experimento fue claramente pertinente." (⁹)

■ 8, 9—En cuanto al octavo error entendemos que resultó probada la alegada conspiración al igual que quedó corroborada la declaración del cómplice o coautor Benjamín del Valle y por lo tanto no eran contrarios a derecho y a la prueba los veredictos del jurado. Tampoco se cometió el noveno error ya que considerados en su totalidad, encontramos que las instrucciones al jurado fueron correctas en derecho y suficientes para poner al jurado en posición de traer un veredicto justo e imparcial. En el transcurso de sus instrucciones al jurado el tribunal a quo enfatizó varias veces en la presunción de inocencia que merecía el acusado; el que toda duda debería resolverse a su favor; en la obligación del pueblo de probar su culpabilidad más allá de toda duda razonable; y en el deber de ellos de resolver a base de la prueba desfilada y no del resumen hecho por el tribunal. (Ver T.E. de 2 de diciembre de 1964 a las págs. 27–29, 84–97.) No erró el tribunal al referirse a Benjamín del Valle como coautor o cómplice ya que ésta es una cuestión de derecho que debía ser determinada por el tribunal, siendo competencia del jurado el considerar si se corroboró su testimonio. Respecto a la corroboración requerida fue sumamente explícito y meticuloso el tribunal en sus instrucciones. (Ver

---

(⁹)*People* v. *Black*, 45 C.A.2d 87 (1941) a la pág. 103. Véase además *People* v. *Sherman*, 97 Cal. App.2d 245 (1950); *People* v. *Skinner*, 123 Cal. App.2d 741 (1954).

T.E. de 2 de diciembre de 1964, págs. 74–78.) En cuanto a las instrucciones el concepto de posesión bajo la Ley de Explosivos entendemos que éstas fueron suficientes. (Ver T.E. de 2 de diciembre de 1964, págs. 8–9.)

*Se confirmará la sentencia apelada.*

El Juez Presidente Señor Negrón Fernández no intervino.