Filed 4/9/26  P. v. Gay CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B334339 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A392702) |
| v. | |
| KENNETH EARL GAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1985, Kenneth Earl Gay (Gay) was convicted of the first degree murder of a police officer and sentenced to death. In 1998, the California Supreme Court found that Gay had received constitutionally inadequate representation during the penalty phase of his trial and vacated the judgment of death. (*In re Gay* (1998) 19 Cal.4th 771, 780, 830 (*Gay I*), disapproved of in part by *People v. Mataele* (2022) 13 Cal.5th 372, 425, fn. 11.) Upon retrial of the penalty phase, Gay was once again sentenced to death, but, in 2008, the Supreme Court reversed the sentence based on the exclusion of significant mitigating evidence. (*People v. Gay* (2008) 42 Cal.4th 1195, 1198.) In 2020, while Gay was awaiting another penalty retrial, the Supreme Court vacated his murder conviction on the ground of ineffective assistance of counsel during the guilt phase of the 1985 trial. (*In re Gay* (2020) 8 Cal.5th 1059, 1063–1064, 1092 (*Gay II*).)

This appeal concerns Gay's retrial in 2023. A jury found Gay guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and possession of a firearm by a felon (former § 12021). The jury found true special circumstance allegations that the murder was committed to avoid and prevent a lawful arrest (§ 190.2, subd. (a)(5)) and while the victim was engaged in the performance of his duties as a peace officer (§ 190.2, subd. (a)(7)). The jury was unable to reach a verdict on whether Gay personally used a firearm in the commission of the murder (§ 12022.5). The trial court sentenced Gay to a total prison term of life without the possibility of parole plus two years.

We affirm.

---

[1]    All statutory references are to the Penal Code unless otherwise stated.

## FACTS

Because Gay does not challenge the sufficiency of the evidence supporting his convictions, we only briefly summarize the evidence adduced at trial and do so in the light most favorable to the judgment. (See *People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

In April and May 1983, Gay and Raynard Cummings (Cummings), along with their wives, Robin Gay (Robin) and Pamela Cummings (Pamela), committed a series of violent armed robberies. During this period, Cummings told Pamela's sister, Deborah Cantu (Cantu), that he had a gun and showed her a .38 caliber revolver. Cummings told Cantu that "if any cops came to get him, he would blow them away." Cummings also "said that the cops were not going to take him." Pamela heard Gay and Cummings talk about what would happen if they were pulled over by a police officer. Gay and Cummings both said that if that happened, "they would shoot at a police officer."

On June 2, 1983, Gay, Cummings, and Pamela were on their way to buy marijuana. Pamela was driving the group in an Oldsmobile stolen by Cummings. Both Gay and Cummings were on parole.

Pamela failed to make a complete stop at a stop sign. Paul Verna, a Los Angeles Police Department officer, activated the lights on his motorcycle and pulled over the Oldsmobile. Pamela got out of the car and met Officer Verna at the back. Officer Verna went to the front of the car, opened the door, and bent down.

Witnesses gave conflicting testimony about what happened next. Pamela testified that she heard a gunshot from inside the car and saw a gun with a long barrel going across the seats.

3

Officer Verna grabbed his shoulder, turned around, and moved toward his motorcycle. In a matter of seconds, Gay slid across the front seat and got out of the car. Pamela saw Gay run up behind Officer Verna and shoot him three times in the back. Officer Verna fell to his knees, turned around, and fell onto his back, lying face up. Pamela saw Gay stand over Officer Verna and shoot him two more times. Gay threw the gun toward the officer and said, "Mother fucker." Other eyewitnesses corroborated Pamela's identification of Gay as the shooter, while other evidence suggested that it was Cummings alone who shot Officer Verna.

Officer Verna died as the result of multiple gunshot wounds.

Gay and Cummings reenacted the shooting later on June 2, 1983, in the presence of Pamela and Robin. Gay held Officer Verna's gun straight out and said, "'Pow, pow, pow, pow. I got him good.'" Cummings then took the gun and, holding it the same way, said, "'I got him good. Pow, pow, pow.'"

## DISCUSSION

### I. Conspiracy Instruction

The prosecution presented three theories of murder liability: (1) Gay was the direct perpetrator who shot Officer Verna; (2) Gay aided and abetted the commission of the murder; and (3) Gay conspired to commit murder. Gay contends that the trial court incorrectly instructed the jury on the conspiracy theory. We review this claim de novo. (*People v. Frazier* (2024) 16 Cal.5th 814, 839.)

The trial court instructed the jury with CALCRIM No. 416 regarding "Evidence of Uncharged Conspiracy." The jury was

4

told that "[a] member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." According to the instruction, to prove that Gay was a member of a conspiracy, the People were required to establish that (1) Gay "intended to agree and did agree with" Cummings, Pamela, or Robin "to commit murder;" (2) when the agreement was made, Gay and "one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder;" (3) Gay or the other alleged members committed at least one of 48 specified "overt act[s] to accomplish murder;" and (4) "[t]he overt act was committed in California."

Gay argues that the instruction was defective because it identified the uncharged conspiracy as one to commit murder when the prosecution had argued that it was a conspiracy to commit robbery. We disagree.

In closing, the prosecutor argued that "at the time of the agreement," Gay "intended that one or more of them would kill." The prosecutor explained that "the intent to kill is about escape. Escaping justice." The prosecutor referenced the testimony of Pamela, a coconspirator, that Gay and Cummings "talked about killing police officers who got in their way." This argument, in conjunction with the jury instructions, defined the conspiracy as one to commit murder rather than just robbery.

Gay also takes exception with some of the overt acts identified in the jury instruction. He argues that those pertaining to robberies and a car theft could not have been construed as being done for the purpose of accomplishing murder. He also argues that several of the overt acts occurred after the object of the conspiracy—the murder—had been completed. Gay

5

forfeited his arguments, however, by failing to object to the conspiracy instruction on the same grounds in the trial court. (See *People v. Navarro* (2021) 12 Cal.5th 285, 343.)

Forfeiture aside, the claim lacks merit.  The objective of the conspiracy was to commit murder to evade capture for the robberies.  The robberies and other alleged overt acts, including those that took place after the fatal shooting, were undertaken in pursuance of this objective.  (See *People v. Saling* (1972) 7 Cal.3d 844, 852 [recognizing that, under some circumstances, "the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy"].)

Gay next argues that the instruction improperly allowed the jury to use the murder itself as an overt act in furtherance of the conspiracy.  He points to the 38th overt act listed in the instruction:  "Officer Paul Verna was shot and killed so that Cummings, Gay and Pamela . . . could avoid arrest and evade justice."  The trial court did not err.  "Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement.  [Citation.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 121; see also *People v. Maciel* (2013) 57 Cal.4th 482, 518 ["As the object of the conspiracy was to kill [the victim], his murder satisfied the element of an overt act committed in furtherance of the conspiracy"].)

Gay argues that the jurors should have been instructed to decide when the conspiracy ended.  He refers us to no authority so holding, and we are aware of none.  The California Supreme Court has rejected the argument that a trial court errs "by failing

6

to instruct the jury sua sponte to determine when the conspiracy ended." (*People v. Hardy* (1992) 2 Cal.4th 86, 152.)

## II. Pretrial Motions to Dismiss

Gay contends that the trial court committed reversible error by denying three separate pretrial motions to dismiss.

### A. *Nonstatutory motion to dismiss the information*

Details of the deficient performance of Daye Shinn (Shinn), Gay's counsel at his 1985 trial, are described at length in *Gay I*, *supra*, 19 Cal.4th 771 and *Gay II*, *supra*, 8 Cal.5th 1059. In short, as found by the California Supreme Court, Shinn "defrauded Gay in order to induce Gay to retain him instead of the public defender" and went on to commit legal errors amounting to ineffective assistance of counsel at both the guilt and penalty phases of trial. (*Gay II*, *supra*, at pp. 1063–1064.) The Supreme Court described the attorney-client relationship as one "poisoned at its root by fraud." (*Id*. at p. 1084.) In February 2020, the Supreme Court granted Gay habeas corpus relief, vacated the murder conviction, and afforded the People the opportunity to retry Gay. (*Id*. at pp. 1063–1064, 1092–1093.) The People did so but did not again seek the death penalty.

In July 2020, Gay filed a nonstatutory motion to dismiss the original information filed in this case in 1984 based on the California Supreme Court's findings of ineffective assistance of counsel. He argued that the lack of effective counsel at his preliminary hearing resulted in the denial of a substantial right, rendered his commitment for trial unlawful, and warranted setting aside the information.

In December 2020, the trial court heard and denied the motion. The court concluded that it could not take judicial notice of the truth of the facts contained in *Gay I* and *Gay II*, and that

7

the doctrine of collateral estoppel did not apply, observing that the California Supreme Court had not adjudicated the issue of whether Gay received ineffective assistance of counsel at the preliminary hearing.

The trial court concluded that, "even . . . admit[ting] the facts from the prior opinions," Gay had not demonstrated the denial of a substantial right.  The court declined to presume prejudice and found no evidence demonstrating that the original trial "counsel's potential conflict of interest reasonably might have affected the outcome of the preliminary hearing."  The court also concluded that, even if it were to dismiss the information, a valid grand jury indictment would still be in place.

A criminal defendant's "right is substantial when denial of the right results in a denial of due process."  (*Avitia v. Superior Court* (2018) 6 Cal.5th 486, 494 (*Avitia*); see also *Molina v. Superior Court* (2024) 103 Cal.App.5th 291, 305.)  "[D]enial of a substantial right at the preliminary examination renders the ensuing commitment illegal and entitles a defendant to dismissal of the information on timely motion.  [Citations.]"  (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 523.)  But "outside a narrow category of errors that 'by their nature constitute a denial of a substantial right' and hence require dismissal 'without any showing of prejudice,' a defendant seeking to set aside an indictment [or information] before trial must show that an error 'reasonably might have affected the outcome.'  [Citation.]"  (*Avitia, supra,* at p. 497.)

"[W]here . . . the deprivation of a substantial right is not shown in the transcript of the preliminary hearing, the nonstatutory motion to dismiss is the proper device to raise the issue."  (*Stanton v. Superior Court* (1987) 193 Cal.App.3d 265,

8

271; see also *Merrill v. Superior Court* (1994) 27 Cal.App.4th
1586, 1596 ["the nonstatutory motion to dismiss is the
appropriate vehicle for redress of an error not known or visible at
the hearing itself"].)

Shinn's potential conflict of interest with Gay at the
preliminary hearing stage does not fall within "a narrow category
of errors that 'by their nature constitute a denial of a substantial
right'" to warrant the presumption of prejudice. (*Avitia, supra,*
6 Cal.5th at p. 497; see *People v. Pennington* (1991)
228 Cal.App.3d 959, 961 [no denial of a substantial right at a
preliminary hearing where a potential conflict of interest
existed], cited with approval by *People v. Standish* (2006)
38 Cal.4th 858, 882; cf. *People v. Gamache* (2010) 48 Cal.4th 347,
396 ["structural errors not susceptible to harmless error analysis
are those that go to the very construction of the trial
mechanism—a biased judge, total absence of counsel, the failure
of a jury to reach any verdict on an essential element"].)
Accordingly, to obtain dismissal of the information, Gay was
required to show that the potential conflict reasonably might
have affected the outcome of the preliminary hearing. (See
*Avitia, supra,* at p. 497.)

The trial court did not abuse its discretion in denying the
nonstatutory motion to dismiss on the ground that Gay had not
established prejudice. In his motion, Gay failed to identify any
evidence that Shinn's potential conflict had negatively impacted
Gay's preliminary hearing; instead he simply argued that
prejudice should be presumed.

**B.** ***Motion to dismiss based on use of former testimony***

Given the unusual procedural history of this case, resulting
in a decades-long gap between trials, it is unsurprising that both

9

the prosecution and the defense relied on former testimony in presenting their cases.  The prosecution introduced the former testimony of nine out of 39 witnesses.  The defense introduced the former testimony of 15 out of 29 witnesses.

Gay does not contend that the trial court abused its discretion in admitting the prior testimony of any one of the unavailable witnesses.  He argues that "the use of so much former testimony" violated his right to a fair trial, particularly in light of the ineffective assistance of counsel he received at his first trial.  Gay contends that he asserted this argument in a motion to dismiss the case and as a ground in his motion for new trial, and that the court erred by denying those motions.

To the extent that Gay's claim hinges on Shinn's ineffective assistance of counsel, he forfeited it by failing to present the argument to the trial court.  Gay filed a pretrial motion "to dismiss the case" on the ground that, "due to the age of the case, both the prosecution and the defense . . . had to rely upon the use of former testimony in order to present their respective cases."  Gay argued that the "inability to call live witnesses . . . resulted in a deprivation of due process and a fair trial preventing . . . [him] from effectively confronting and cross-examining the witnesses whose former testimony was introduced against him, as well as prevented . . . [him] from effectively presenting a defense with live witnesses."  The motion to dismiss contained no reference to Shinn, let alone the argument that Shinn's ineffective assistance of counsel rendered his examinations of the prior witnesses deficient.  Nor did counsel raise this ground when the trial court heard the motion.

Gay's motion for new trial also failed to preserve the issue.  As relevant here, the motion argued that due process

10

"compel[led] the granting of a new trial" because the trial court had "deemed the defense ready when the defense still had significant work to perform on the case." The motion contended that defense counsel had been unable to file a motion to exclude prior testimony from the 1985 trial based on Shinn's incompetence because counsel at the 2023 retrial "was not able to complete the gathering of all such examples which would have been needed as exhibits to the motion." The admission of former testimony itself was not raised as a ground for new trial; thus, it would have been error for the trial court to grant it on that basis. (See *People v. Masotti* (2008) 163 Cal.App.4th 504, 508 ["A motion for new trial may be granted only upon a ground raised in the motion"].)

The only argument sufficiently preserved to be cognizable on appeal is that Gay was prejudiced by the use of former testimony because the jury was unable "to observe the witnesses' demeanor and credibility" and some of the former testimony was "difficult to follow" when referencing exhibits. At the hearing on the motion to dismiss, defense counsel referred to the absence of some transcript pages of former testimony and argued that it was the "cumulative effect" of the unavailability of so many witnesses that prejudiced Gay.

The trial court did not abuse its discretion by denying the motion to dismiss. The court recognized that "one of the fundamental problems built into a case of this age" is the need for prior testimony. The court explained that "[w]hen exhibits were referred to in the prior testimony, [the court] certainly tried [its] best to make sure that [it] was informing the jury what the new exhibit number was that was marked in [the current] trial as it corresponded to the prior proceedings." No ground for reversal

11

appears on this record.  (See *People v. Memro* (1995) 11 Cal.4th 786, 850 ["A court abuses its discretion when its ruling 'falls outside the bounds of reason[]'"].)

## C. *Motion to dismiss for outrageous government conduct*

Outrageous government conduct may warrant the dismissal of criminal charges.  (*People v. Fultz* (2021) 69 Cal.App.5th 395, 431–432.)  "When conduct on the part of the authorities is so outrageous as to interfere with an accused's right of due process of law, proceedings against the accused are thereby rendered improper.  [Citations.]"  (*Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, 429.)  "Dismissal of charges is an extraordinary remedy, which is reserved for the few cases where conduct by the prosecution has completely eliminated the possibility of a fair retrial.  [Citation.]"  (*People v. Kasim* (1997) 56 Cal.App.4th 1360, 1387 (*Kasim*).)

"The determination of whether the government engaged in outrageous conduct in violation of [a] defendant's due process rights is a mixed question.  The first step involves the consideration and weighing of the evidence . . . to determine factually whether, and to what extent, governmental misconduct occurred.  This factual determination is clearly one that is subject to a deferential standard of review.  But the second step— whether the governmental conduct constitutes outrageous conduct in the constitutional sense of violating [a] defendant's due process rights—involves the application of law to the established facts and is primarily a legal question."  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857–858.)  Ultimately, "the sanction of dismissal is clearly discretionary and is only required

in particularly egregious cases." (*People v. Truer* (1985) 168 Cal.App.3d 437, 443.)

Gay filed a pretrial motion to dismiss based on outrageous governmental conduct, arguing that (1) calling Pamela as a witness would amount to suborning perjury because she was a known liar and perjurer, and (2) the prosecution engaged in outrageous conduct by entering into a plea agreement with Pamela before Gay's 1985 trial that was contingent on her testifying a particular way and, when Pamela failed to testify in that manner, she was sentenced to prison on the prosecution's recommendation for violating the agreement.

The motion relied on a letter from September 9, 1985—after Gay was originally convicted but before he was sentenced to death—submitted by Deputy District Attorney John Watson (Watson) recommending that Pamela "be sentenced to state prison for her involvement in the crimes of robbery and accessory to murder." The recommendation was based, first, on "the seriousness of the crimes and the degree of her involvement in them, and second[], her failure to comply with the agreement she made in the case settlement joined in by the District Attorney's Office and accepted by the court." Watson referred to Pamela's "repeated refusal . . . to be truthful in her testimony" in Gay's criminal case. Watson went on to set forth "some concrete references and citations which the People believe[d] prove[d] . . . [that Pamela] did not honor her agreement to be an honest witness."

The trial court denied the motion. The court explained that the relevant evidence was that Pamela "gave inconsistent versions of the events, when comparing her initial statement to her later testimony; that [the] former prosecutor wrote a letter

13

to . . . [Pamela's] sentencing judge stating that he believed she lied;" and that the prosecution "fail[ed] to turn over the letter detailing . . . [the former prosecutor's] beliefs to the defense in 1985." The court concluded that there was "no outrageous government conduct that shocks the conscience meriting a dismissal[,]" as there was "no evidence the prosecution team deliberately and intentionally withheld the letter between 1985 and 1998, . . . failed to turn over . . . [Pamela's] sentencing transcript[,]" or "have and/or will continue to suborn perjury if Pamela . . . is called to testify."

The trial court did not err. Nothing before it compelled a finding of prosecutorial misconduct of such magnitude as to warrant the "extraordinary remedy" of dismissal. (*Kasim, supra,* 56 Cal.App.4th at p. 1387.)

The trial court reasonably concluded that, despite inconsistencies in Pamela's prior testimony, no "factual judicial finding" had ever been made that Pamela committed perjury. Gay argues that the only reasonable inference from the evidence is that Pamela was sentenced to serve three years in prison because her sentencing court found that she had perjured herself at Gay's original trial.

As the trial court here observed, "[i]t is entirely equally plausible that the sentencing court felt that imposing anything less than three years would have been insufficient given the nature and scope of the crimes . . . [Pamela] was involved with." Indeed, the first ground raised in the former prosecutor's 1985 letter to Pamela's sentencing court in support of his recommendation that Pamela serve prison time was "the seriousness of the crimes and the degree of her involvement in them[.]"

14

The trial court also found that Pamela "knew she would receive leniency if she testified truthfully" but that there was "no evidence that her leniency agreement was predicated on anything else." We reject Gay's attacks on this finding. "[W]hen [an] accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police [citation], or that his testimony result in the defendant's conviction [citation], the accomplice's testimony is 'tainted beyond redemption' [citation] and its admission denies the defendant a fair trial." (*People v. Allen* (1986) 42 Cal.3d 1222, 1251–1252.)

This principle, however, is "violated only when the agreement requires the witness to testify to prior statements 'regardless of their truth,' but not when the truthfulness of those statements is the mutually shared understanding of the witness and the prosecution as the basis for the plea bargain. [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 863.) Nothing in the record compels a finding that Pamela was coerced by the prosecution to testify in a particular manner "'regardless of the[] truth[.]'" (*Ibid.*)

Gay was not deprived of the right to a fair retrial. Pamela was available to and did testify at the 2023 retrial, where she was subject to rigorous cross-examination by the defense. She testified that her understanding of her plea agreement was "[t]hat if [she] testified truthfully, that they would drop the murder charge and some of the robberies" and that she would be sentenced to "probation and time served." Defense counsel later asked Pamela if she "ha[d] to testify in a certain way" pursuant to the agreement. Pamela responded, "I had to tell the truth." Pamela admitted that she had nevertheless lied while testifying in 1985. It was the role of the jury to assess Pamela's credibility.

15

## III. Evidentiary Issues

Gay raises various challenges to the trial court's evidentiary rulings, which we review for abuse of discretion. (*People v. Caro* (2019) 7 Cal.5th 463, 503 (*Caro*); *People v. Thompson* (2010) 49 Cal.4th 79, 130.) Under this standard, we will not disturb the ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

### A. *Motion to strike Pamela's testimony*

After Pamela finished testifying, Gay moved to strike her testimony in its entirety. In addition to asserting the same grounds raised in the motion to dismiss for outrageous government conduct, Gay based his motion to strike on the loss of evidence that Gay claimed could have been used for impeachment purposes. The motion to strike was denied.

For the same reasons that we have found no error in the trial court's denial of Gay's motion to dismiss for outrageous government conduct, we also find no abuse of the court's discretion in denying the motion to strike Pamela's testimony.

Nor did the trial court abuse its discretion in rejecting the alternate ground for the motion to strike—the loss of evidence. Gay contends that he was deprived a fair trial because his ability to cross-examine Pamela was impaired by the loss of (1) the results of a polygraph test, (2) letters between Cummings and Pamela that could have "potentially . . . provided exculpatory evidence in the form of confessions," and (3) the original prosecutor's notes regarding subjects about which he had accused Pamela of lying. It is entirely speculative that any of this evidence would have provided different or more effective grounds

16

upon which to impeach Pamela.  Pamela admitted to lying at Gay's first trial and was cross-examined extensively at his 2023 retrial.  Any loss of evidence did not materially hamper Gay's ability to impeach Pamela or otherwise defend himself.

## B. *Restrictions on use of Pamela's prior convictions*

Gay sought to impeach Pamela with the details of her 1997 misdemeanor conviction for disturbing the peace (§ 415) and her 2004 conviction for the unlawful transportation of marijuana (former Health & Saf. Code, § 11360, subd. (a)).  The trial court excluded the introduction of the disturbing the peace conviction.  The court permitted the defense to introduce Pamela's conviction for unlawful transportation of marijuana but excluded details of the offense.  Gay argues that the court abused its discretion.

"'Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352.' [Citations.]  '[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.  The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]"  (*People v. Smith* (2007) 40 Cal.4th 483, 512–513.)

The trial court did not abuse its broad discretion.  As the court observed, the jury had already heard evidence of Pamela's "involvement in at least ten different robberies, one transportation of marijuana, [and] arguably a murder of a police officer."  In addition, Pamela admitted that she had "lied many times."  Under these circumstances, the fact of an over 25-year-old misdemeanor conviction for disturbing the peace and the underlying circumstances of a 19-year-old drug conviction were of

17

minimal impeachment value and were reasonably excluded under Evidence Code section 352.

### C. *Unfair application of hearsay exceptions*

Gay contends that his right to due process was denied by the unfair application of the past recollection recorded and prior inconsistent statement exceptions to the hearsay rule.

Hearsay evidence—"evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"—is inadmissible except as provided by law. (Evid. Code, § 1200, subds. (a), (b).)

Evidence Code section 1237 creates an exception to the hearsay rule for past recollections recorded. (*People v. Royal* (2019) 43 Cal.App.5th 121, 143.) It provides, in part: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement." (Evid. Code, § 1237, subd. (a).)

"Another exception to the general hearsay rule applies to statements that are inconsistent with a witness's trial testimony.

18

(Evid. Code, § 1235.)  Such statements are admissible for their truth only when the witness has been given 'an opportunity to explain or to deny the statement' or is still subject to providing further testimony, unless 'the interests of justice otherwise require.'  ([Evid. Code], § 770, subd. (a); [Evid. Code], § 1235 [a statement inconsistent with trial testimony must be offered in compliance with Evid. Code, § 770].)"  (*People v. Wilson* (2024) 16 Cal.5th 874, 922.)

Gay does not claim that the trial court erred in admitting or excluding any particular evidence pursuant to the past recollection recorded and prior inconsistent statement exceptions to the hearsay rule.  Gay argues that, while the prosecution was able to introduce the statements of multiple witnesses made "shortly after Verna's murder" under these hearsay exceptions, "state evidentiary standards did not allow [the defense] to present statements that were obtained years later from witnesses who claimed a complete failure of recollection at trial" or who "professed an inability to remember their prior testimony."  Gay attributes the lack of exculpatory statements made close in time to the murder to Shinn's incompetence and failure "to conduct any investigation."  He argues that the trial court's "disparate" application of these evidentiary rules deprived him of a fair trial.

We disagree.  "'"[A] defendant does not have a constitutional right to the admission of unreliable hearsay statements.'" [Citation.]"  (*People v. Westerfield* (2019) 6 Cal.5th 632, 705.)  "Although completely excluding evidence of an accused's defense theoretically could rise to [the] level" of infringing on the due process right to present a defense (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103), "[a]pplication of the ordinary rules of evidence, as the trial court did here, does not" (*People v.*

19

*Mincey* (1992) 2 Cal.4th 408, 440). Gay remained able to present a vigorous defense, calling 29 witnesses and engaging in detailed cross-examination of others. "[T]here was no refusal to allow [him] to present a defense, but only a rejection of some evidence concerning the defense." (*In re Wells* (1950) 35 Cal.2d 889, 894.)

Gay's reliance on *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) is misplaced. "*Chambers* was an exercise in highly case-specific error correction. At issue were two rulings by the state trial court at Chambers' murder trial[,]" which the United States Supreme Court held "were erroneous[.]" (*Montana v. Egelhoff* (1996) 518 U.S. 37, 52 (plur. opn.) (*Egelhoff*).) "[T]he holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Egelhoff*, *supra*, at p. 53.)

Here, in contrast, Gay has not shown that the trial court's application of the hearsay rules was erroneous or that any excluded hearsay statement "bore persuasive assurances of trustworthiness." (*Chambers*, *supra*, 410 U.S. at p. 302.) The court did not apply evidentiary rules in a disparate manner and neither abused its discretion nor violated due process.

### D. *Adoptive admissions*

Gay contends that the trial court erred by admitting a statement made by Cummings as an adoptive admission.

Deputy Sheriff David La Casella testified that he was a bailiff at Gay's 1985 trial. After a medical examiner testified about "[gun]shot number 6" at the 1985 trial, Deputy La Casella escorted Gay and Cummings to the courthouse's main lockup

facility. As Deputy La Casella was leaving the lockup, he heard Cummings yell to Gay, "'You know how he got number 6, don't you?'" Gay responded, "'Number 6?'" Cummings replied, "'Yeah. Gunshot number 6. That's the one I put in the mother fucker.'" Gay did not respond. Cummings stated, "'I know exactly how he got all of them, and I know exactly where he was when he got them.'"

During closing argument, the prosecutor argued that Cummings's statement claiming responsibility for gunshot number 6 was made during a conversation "between the two perpetrators of this crime." The prosecutor later described the statement as "an adoptive admission."

The trial court instructed the jury with CALCRIM No. 357 on adoptive admissions. The instruction informed the jurors that if they "conclude[d] that someone made a statement outside of court that tended to connect the defendant or an uncharged co-conspirator with the commission of the crime and the defendant or an uncharged co-conspirator did not deny it," they had to decide whether (1) "[t]he statement was made to the defendant or an uncharged co-conspirator or made in his presence;" (2) "[t]he defendant or an uncharged co-conspirator heard and understood the statement;" (3) "[t]he defendant or an uncharged co-conspirator would, under all the circumstances, naturally have denied the statement if he thought it was not true;" and (4) "[t]he defendant or an uncharged co-conspirator could have denied it but did not." If the jury found that these requirements were met, it could "conclude that the defendant . . . admitted the statement was true."

21

Gay argues that Cummings's statement was improperly admitted because it did not call for a response, particularly in light of Gay's constitutional right to remain silent.

Evidence Code section 1221 sets forth the adoptive admission exception to the hearsay rule, providing that "[e]vidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." "The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct. 'There are only two requirements for the introduction of adoptive admissions: "(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement." [Citation.]' [Citation.] Admissibility of an adoptive admission is appropriate when "'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .'" [Citation.]" (*People v. Combs* (2004) 34 Cal.4th 821, 843.)

The trial court did not abuse its discretion in admitting Deputy La Casella's testimony. From Gay's silence in response to Cummings's statement that Cummings had "'put'" "'[g]unshot number 6'" in Officer Verna, a reasonable juror could infer that Gay was responsible for the other gunshot wounds. Cummings and Gay were speaking to each other—they were not talking to

22

law enforcement, testifying, or otherwise responding to an official accusation, in which Gay's silence could fairly be attributed to his reliance on his right to remain silent.

"The circumstances warranted presenting the evidence to the jury and letting the jury decide what weight to give it." (*People v. Riel* (2000) 22 Cal.4th 1153, 1189.)  It was a question for the jury whether Gay had actually adopted Cummings's statement.  (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011 ["To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether [the] defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide"].)

### E.  *Limitations on defense expert testimony*

Gay asserts that the trial court abused its discretion by limiting the testimony of two defense expert witnesses.

Expert opinion testimony may be admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact[.]"  (Evid. Code, § 801, subd. (a).)  "Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.  [Citation.]"  (*People v. Torres* (1995) 33 Cal.App.4th 37, 45 (*Torres*).)  "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies,

23

or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772.)

A trial court's "broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury[]'" extends to expert testimony. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

### 1. Dr. Solomon

The defense sought to introduce the testimony of Dr. Kenneth Solomon, who conducted an experiment in 2000 with the Oldsmobile that Pamela had been driving in 1983 when she was stopped by Officer Verna. The purpose of the experiment was to "assess timing issues" and "whether it would be consistent with being shot by a single person, by two people, and which person, someone in the front seat or back seat." According to the defense, Dr. Solomon's testimony "would tend to support the defense theory that . . . Cummings was the only person, the sole person, who fired all of the shots at Officer Verna and that . . . Gay could not have fired those shots."

At the conclusion of an Evidence Code section 402 hearing, the trial court ruled that Dr. Solomon would be permitted to testify as to his "observations of the vehicle." The court would not, however, allow Dr. Solomon to testify "regarding the experiments that he took, and how long it would have taken . . . [Gay] and . . . Cummings to exit the car[.]" The court concluded that the excluded testimony was "not 'related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact[,]'" and that it was "based on

24

speculation, conjecture, dissimilar scenarios, different actors and different conditions, and, subject to [Evidence Code section] 352, its probative value [wa]s substantially outweighed by the probability that its admission w[ould] create confusion of the issues and/or mislead[] the jury."

The trial court acted well within its broad discretion in precluding Dr. Solomon from testifying about his experiments. The court was reasonably concerned that no attempt was made "to replicate what was happening on the night in question in terms of a traffic stop made on people who were accused of participating in a series of violent robberies and, arguably, trying to prevent their arrest and escape." The evidence could easily mislead the jury and was, thus, properly subject to exclusion under Evidence Code section 352. (See *People v. Skinner* (1954) 123 Cal.App.2d 741, 752 ["there were too many variables that would offset any value that might result from performance of such experiments"].)

### 2. Dr. Michel

The defense made an offer of proof that Dr. Paul Michel, a doctor of optometry and forensic specialist in human vision, would testify that a cinder block wall would have blocked the view of Marsha Holt (Holt), who had testified that she saw Gay shoot Officer Verna. Dr. Michel's testimony was based on his observations in 2000 from the bedroom where Holt testified that she had been during the shooting and from his inspection of the crime scene. The trial court permitted Dr. Michel to testify generally on human vision, including about "confounded vision," and static measurements he had made. Gay argues that the trial court abused its discretion by precluding "Dr. Michel's testimony

25

about what could be seen, or not seen, through the window . . . Holt was looking out of when she purportedly saw the shooting."

There was no abuse of discretion. Gay did not establish that Dr. Michel's proffered testimony required expertise beyond common experience. (See Evid. Code, § 801, subd. (a).) As the trial court observed, the defense could show the jury pictures, ask Dr. Michel if a person can "see through a solid object," and then make arguments regarding the conclusions the jury should draw from the evidence. The court properly excluded testimony that would have "consist[ed] of inferences and conclusions" that could have been "drawn as easily and intelligently by the trier of fact as by the witness." (*Torres*, *supra*, 33 Cal.App.4th at p. 45.)

### F. *Exclusion of animation*

Gay sought to introduce a video animation purporting to illustrate the defense theory of how the shooting took place. Gay planned to have Jason Fries, a forensic scientist and human factors expert, testify about the creation of the video using laser scanning of the crime scene.

The trial court excluded the animation. The court questioned its foundation, describing it as "shaky at best." Rather than being "objective and fact-driven," the animation contained argument and legal conclusions. For example, while the animation accurately depicted Cummings's clothing, hairstyle, and facial hair, "the avatar of . . . Gay d[id] not accurately depict the description given by witnesses and [wa]s devoid of any identifying features, such as facial hair, which might give an inference that witness identifications of Cummings were accurate, whereas those of . . . Gay were not." A heading also appeared at the top of the video stating, "'All physical evidence is consistent with Raynard Cummings being the

26

shooter.'"  The court added that the defense could make such arguments in closing but could not "present an animation that is argumentative, misleading, and speculative to the jury."  The court also stated that it was excluding the video under Evidence Code section 352.

Gay argues that the trial court used "an improper standard" to exclude the animation—"that a computer animation must be an accurate portrayal of the evidence presented by both the prosecution and the defense."

The trial court did not abuse its discretion.  Computer animation may be admitted "as demonstrative evidence of expert testimony, but only if certain conditions are met.  The animation must accurately depict an expert opinion, the expert opinion must fairly represent the evidence, the trial court must provide a proper limiting instruction, and the animation must be otherwise admissible under Evidence Code section 352.  [Citation.]"  (*Caro*, *supra*, 7 Cal.5th at p. 509.)  Here, the court correctly invoked these requirements and concluded that the animation, and impliedly the expert opinion it represented, did not fairly represent the evidence.  This was a proper basis to exclude it.

## IV.  Prosecutorial Misconduct

Gay contends that the prosecutor committed misconduct during rebuttal argument.  Specifically, the prosecutor argued that a prior defense counsel and a prior defense investigator acted unethically in 2000 when they interviewed an eyewitness by only recording part of the interview and that other examples existed of the defense team's attempts to influence testimony.  Gay also claims that the prosecutor belittled the defense expert witnesses and suggested that they had nothing of significance to say.

27

"A prosecutor's conduct violates the federal Constitution only when it is ""so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."" [Citations.]  A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."" [Citation.]  A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence.  [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)

The trial court did not abuse its discretion when it declined to find prosecutorial misconduct.  (*People v. Dworak* (2021) 11 Cal.5th 881, 910 [review for abuse of discretion].)  The court explained that the prosecutor's arguments "certainly were vigorous" but did not "cross[] the line into misconduct."  This conclusion was reasonable and not contrary to law.  The prosecutor was permitted to describe perceived deficiencies in defense tactics so long as his argument did not amount to an impermissible accusation that defense counsel fabricated a defense.  (See *People v. Bemore* (2000) 22 Cal.4th 809, 846.)  It did not.  As for the purported denigration of defense expert witnesses, the prosecutor's statements did not rise to the level of deception.  "Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie.  [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522; see also *People v. Peoples* (2016) 62 Cal.4th 718, 797 ["While characterizing the testimony of defense witnesses as 'bull' is of

28

dubious persuasive value, it falls within the prosecutor's wide latitude to comment on the evidence during closing argument"].)

Gay has not shown grounds for reversal based on prosecutorial misconduct.

## V. Racial Justice Act

Gay contends that the prosecution violated the California Racial Justice Act of 2020 (RJA; § 745) when it introduced into evidence "a photograph of [him] at trial that portrayed him as a dark-skinned African-American when he actually was light-complected."

"The RJA, which took effect January 1, 2021, provides that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.' (§ 745, subd. (a).)" (*People v. Corbi* (2024) 106 Cal.App.5th 25, 37 (*Corbi*).) The RJA is violated when, "[d]uring the defendant's trial, . . . an attorney in the case . . . exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) A motion under the RJA "made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation. A motion that is not timely may be deemed waived, in the discretion of the court." (§ 745, subd. (c).)

The trial court rejected Gay's RJA claim, first raised in a motion for new trial, on the grounds that it was untimely and that Gay failed to make a prima facie showing for relief. Gay has not established that the court abused its discretion in denying the RJA claim based on its untimeliness. (Cf. *Mission Imports, Inc. v. Superior Court* (1982) 31 Cal.3d 921, 932 ["Where, as here, the trial court has discretionary power to decide an issue, its decision

29

will be reversed only if there has been a prejudicial abuse of discretion"].)

As the trial court explained, had Gay made a contemporaneous objection to the use of the challenged photograph based on the RJA, "the court certainly could have addressed it at that time and admonished the jury." That the court later rejected the RJA claim on its merits did not render such an objection futile. (See *Corbi*, *supra*, 106 Cal.App.5th at p. 42 ["had defense counsel presented the RJA claim to the trial court as soon as practicable, the defense could have pursued 'a remedy specific to the violation' much sooner—even before the jury began deliberations"].) Gay points to nothing arbitrary, capricious, or patently absurd in the court's ruling to warrant reversal. (See *People v. Boyce* (2014) 59 Cal.4th 672, 687.)

Because Gay's RJA claim was properly rejected as untimely, we also reject the argument that the trial court erred in denying his request for discovery under the RJA and for a continuance to conduct such discovery.

## VI. Sentencing

Gay contends that the imposition of a more severe two-year sentence for possession of a firearm by a felon (former § 12021) compared to the eight-month sentence originally imposed for that crime in 1985 violated the prohibition against double jeopardy. He is mistaken.

In accordance with double jeopardy (Cal. Const., art. I, § 15) and due process principles (Cal. Const., art. I, § 7, subd. (a)), "'after successful appeal of a conviction a defendant may not upon reconviction be subjected to an aggregate sentence greater than that imposed at the first trial.' [Citation.]" (*People v. Villanueva* (2011) 196 Cal.App.4th 411, 420.) Here, Gay's original aggregate

30

sentence was death, plus a total of 28 years 8 months in prison. Following his retrial in 2023, he was sentenced to life without the possibility of parole, plus two years.  Because his aggregate sentence is less than that originally imposed, there is no double jeopardy violation.  (See *People v. Craig* (1998) 66 Cal.App.4th 1444, 1452 [double jeopardy not implicated where a greater sentence for an offense was imposed on retrial, but the aggregate sentence remained less than that originally imposed].)

## VII.  Cumulative Error

Gay asserts that he was denied a fair trial based on the cumulative impact of alleged errors and prosecutorial misconduct.  "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant.  [Citations.]"  (*People v. Capers* (2019) 7 Cal.5th 989, 1017.)  We have found no errors that individually or collectively deprived Gay of a fair trial.  (See *People v. Lopez* (2018) 5 Cal.5th 339, 371 ["Because we have found no error, there is no cumulative prejudice to evaluate"].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


GILBERT, J.*

We concur:


LUI, P. J.


RICHARDSON, J.

---